1

2

3

4

5

6

7 **IN THE UNITED STATES DISTRICT COURT**

8 **FOR THE EASTERN DISTRICT OF CALIFORNIA**

9

10 DOCTORS MEDICAL CENTER          CASE NO. CV F 10-0452 LJO SKO
   OF MODESTO, INC.,

11                                 **SUMMARY JUDGMENT DECISION**
                   Plaintiff,       (Doc. 36.)

12        vs.

13 PRINCIPAL LIFE INSURANCE
   COMPANY,

14
                   Defendant.

15 _____/

16                        __INTRODUCTION__

17        Defendant Principal Life Insurance Company ("Principal") seeks summary judgment in the

18 absence of supporting evidence for plaintiff Doctors Medical Center of Modesto, Inc.'s ("DMC's")

19 breach of contract and fraud claims for unpaid medical services.  DMC responds that Principal

20 misapplies and misinterprets medical services agreements to create genuine issues of material fact to

21 prevent summary judgment.  This Court considered Principal's summary judgment motion on the record[1]

22 and VACATES the April 19, 2011 hearing, pursuant to Local Rule 230(g).  For the reasons discussed

23 below, this Court DENIES summary judgment as to all claims but one.

24 _____

25        [1]     This Court carefully reviewed and considered the record, including all evidence, arguments, points and
   authorities, declarations, testimony, statements of undisputed facts and responses thereto, objections and other papers filed
26 by the parties.  Omission of reference to evidence, an argument, document, objection or paper is not to be construed to the
   effect that this Court did not consider the evidence, argument, document, objection or paper. This Court thoroughly reviewed,
27 considered and applied the evidence it deemed admissible, material and appropriate for summary judgment. This Court does
   not rule on objections in a summary judgment context, unless otherwise noted.
28

                                          1

## BACKGROUND

### Summary

DMC is an acute-hospital in Modesto.  Principal is an insurance company and provides group health insurance and administrative services to self-funded employee benefit plans.  DMC claims that Principal is liable for higher contracted rates for hospital services for four patients and which DMC provided on Principal's authorization in 2008.  Principal contends that DMC seeks higher rates under an inapplicable contract and that DMC was paid proper rates under applicable contracts.

### Aetna Network Agreement With Principal

Principal contracts with Preferred Provider Organizations ("PPOs"), including Aetna Signature Administrators ("ASA" or "ASA Plan").  Principal neither owns nor operates a California PPO network.

Principal and Aetna Life Insurance Company ("Aetna Life")[2] entered into a May 14, 2007 Aetna Signature Administrators Network Administration, Coordination and Oversight Agreement ("ASA Network Agreement") by which Principal is a third-party administrator for the ASA Plan.  Under the ASA Network Agreement, Principal agreed to administer claims and provide services to employers under self-funded health benefit plans.  Aetna Life agreed to provide the employers access to Aetna Life's network of participating providers.

Under the ASA Network Agreement, Principal and Aetna Life share administration of self-insured health plans.  Aetna Life provides network service, claim repricing, stoploss insurance to plan sponsors or customers, and standards for Principal.  Aetna Life ensures Principal's compliance with the standards.  Principal processes claims, provides customer service, and pre-certifies services using Aetna Life standards.

When Principal contracts with an employer to administer its employee benefit plan, the employer selects the medical plan and PPO network and informs Principal.  Principal creates and issues member identification cards to eligible employees.  The identification cards indicate the name of the primary PPO

---

[2]       Principal's papers reference several Aetna entities and includes many references to "Aetna."  DMC's papers at one point define "Aetna" as Aetna Insurance Company and later define "Aetna" as Aetna Health of California, Inc. and Aetna Health Management, Inc. collectively.  Where possible, this Court attempts to identify that specific Aetna entity and references merely "Aetna" when the parties do so without identifying the particular Aetna entity.  Confusion as to an applicable Aetna entity is attributable to the parties.

1  selected by employer under "Managed Care Network/Preferred Provider Organization."  Principal has

2  a PPO Complementary Network Arrangement with MultiPlan, Inc. ("MultiPlan") and includes the

3  MultiPlan logo on the back of member identification cards to identify the contractual relationship.[3]

4  **Aetna PPO Agreement With DMC**

5      Effective July 1, 2007, DMC entered into a Managed Care Agreement ("Aetna PPO Agreement")

6  with Aetna Health of California, Inc. and Aetna Health Management, Inc.  DMC agreed to provide

7  medical services at reduced rates to patients who participated in certain health plans provided by Aetna

8  Health of California, Inc. and Aetna Health Management, Inc.  Under the Aetna PPO Agreement, DMC

9  committed to provide "hospital care, facilities, equipment and services which are Covered Services

10  under Members' Plans."  The Aetna PPO Agreement defines "Member" as an "individual covered by

11  or enrolled in a Plan" and "Plan" as "[a]ny health benefit product, plan or program issued, administered

12  by Company or one of its Affiliates."  The Aetna PPO Agreement identifies Aetna Health of California,

13  Inc. and Aetna Health Management, Inc. as "Company."  The Aetna PPO Agreement defines Affiliate

14  as any "legal entity (including any Plan) owned or controlled by Company."  Principal summarizes that

15  the Aetna PPO Agreement required DMC to provide hospital services to "Aetna Members covered under

16  Plans."

17      DMC notes that it "did not agree to provide reduced rates to patients who participated in any of

18  the various plans provided by Aetna" and agreed to provide "reduced rates only to patients who

19  participated in the Aetna plans that were specifically identified in the Aetna PPO Agreement."  Pursuant

20  to the Aetna PPO Agreement, DMC "agrees to participate in the Plans and other health benefit products

21  listed on the Product Participation Schedule attached hereto and made a part hereof."

22      Attached to the Aetna PPO Agreement is a "Product Participation Schedule" by which DMC

23  agreed to participate in "PPO and NAP Plans (also referred to as 'Non-Gatekeeper' in the Agreement).

24  Including, but not limited to, the following Plans: Open Choice and National Advantage and any Aetna

25  Health Fund product built off the PPO and NAP platform."  DMC notes that the ASA Plan in not

26  included in the Aetna PPO Agreement's Product Participation Schedule.  In her declaration, Amy Dozier

27

28      [3]      DMC describes Principal as a MultiPlan "client."

1    ("Ms. Dozier")[4] states: "In 2008, [DMC] did not participate in the ASA Plan."

2          Edward Tanida ("Mr. Tanida") is the Aetna Insurance Company Region Network Operations

3    Head.  In his declaration, Mr. Tanida states: "The PPO Agreement is an 'all products contract.'  ASA

4    is a product included in this description.  Nothing in the negotiations between Aetna and [DMC], nor

5    the actual PPO Agreement excludes ASA products."  Mr. Tanida explains that ASA is neither an Aetna

6    affiliate nor company but is "an Aetna PPO network, i.e. a product offered by Aetna."  Mr. Tanida notes

7    that "Aetna Signature Administrators" is a "registered service mark" owned by Aetna, Inc., which is the

8    "ultimate parent company of Aetna Health of California, Inc. and Aetna Health Management, Inc."  Mr.

9    Tanida continues that the ASA Plan "is not an 'affiliate' of Aetna in that it is not a corporation,

10   partnership or other legal entity owned or controlled by Aetna."

11         The Aetna PPO Agreement includes an "Introduction of New Plans and Products" provision

12   which states:

13          Company reserves the right to introduce and designate [DMC's] participation in new
            Plans and products during the term of this Agreement and will provide [DMC] with
14          written notice of such new Plans and products and the associated compensation; provided
            that Company shall not require [DMC] to participate in any of such new Plans or
15          products unless it contains incentives to members to utilize participating providers and
            Covered Benefits, at least materially comparable to those contained in the products listed
16          in the Product Participation Schedule.  In the event [DMC] determines that any new
            Plans or products are not materially comparable to existing programs, [DMC] may
17          decline participation in such programs; in such case, Company and [DMC] shall
            negotiate alternative rates that shall apply to Members enrolled in such new Plans or
18          products.  **If Company and [DMC] cannot reach agreement on new rates for the new
            Plans or products, the terms of this Agreement shall not apply to [DMC] services**
19          **provided to Members enrolled in such new Plans or product.**

20   Ms. Dozier declares that Aetna neither provided DMC with "written notice of such new Plans and

21   Products and the associated compensation" for the ASA Plan nor introduced and designated the ASA

22   Plan as required under the Introduction of New Plans and Products provision.  Ms. Dozier concludes that

23   DMC "never agreed to allow the ASA product to access discounted rates until 2010."

24         The Aetna PPO Agreement includes an integration clause:

25          This Agreement (including any attached schedules) constitutes the complete and sole
            contract between the parties regarding the subject hereof and supersedes any and all prior
26

27          [4]        Ms. Dozier is AVP, Managed Care with Tenet Healthcare Corporation ("Tenet"), DMC's parent
     corporation.  Ms. Dozier notes that she is responsible for agreements with managed care companies, including Aetna
28   Insurance Company, and arrangements by which companies such as Principal access discounted rates for Tenet facilities.

                                                        4

or contemporaneous oral or written communications or proposals not expressly included herein.  Upon the signing of this Agreement, all prior provider services agreements between Company and [DMC] are terminated.

### Aetna PPO Agreement Amendment With DMC

Effective January 1, 2010, DMC, Aetna Healthcare of California, Inc. and Aetna Health Management, LLC entered into an amendment ("2010 Amendment") of the Aetna PPO Agreement.  The 2010 Amendment includes a Product Participation Schedule which states:

> The following Non-Gated Health Benefit Products shall also be paid according to the Services and Compensation Schedules attached to this Agreement:
> *       *Aetna Signature Administrators.*  (Underlining and italics on original.)

The 2010 Amendment includes the ASA Plan as a "Non-Gated Health Benefit Product" to be paid "according to the Services and Compensation Schedules attached to this Agreement."

The 2010 Amendment further provides:

> 1.      The Hospital Services and Compensation Schedule is deleted in its entirety and replaced with the attached Hospital Services and Compensation Schedule.
>
> 2.      The Product Participation Schedule is deleted in its entirety and replaced with the attached Product Participation Schedule.
>
>          . . .
>
> 4.      Both parties agree to transition to a new Tenet national boilerplate base agreement as negotiated between Aetna and Tenet.  The attached Compensation Schedule will remain the same until such time as Aetna and Tenet agree to convert to a new rate structure for all Tenet hospitals or as otherwise agreed upon. . . .
>
> 5.      All other terms and provisions of the Agreement not amended hereby shall remain in full force and effect.  In the event of any inconsistency between the terms of this Amendment and the Agreement, the terms of this Amendment shall govern and control.

DMC points out that express reference to the ASA Plan is limited to the 2010 Amendment.

### Aetna Master Agreement With Tenet

Principal notes that the Aetna PPO agreement is not the sole contract to govern DMC's reimbursement for services.  Principal points to the July 1, 2007 Master Agreement ("Master Agreement") between Aetna Health Management, LLC and Tenet.  DMC claims that only the Aetna PPO Agreement "governed the amounts [DMC] would be paid for providing medical services to Aetna's insureds."

The Master Agreement addresses a "standard national hospital agreement and compensation schedule" and provides:

> 1.  The parties agree to enter into a National Agreement . . . and standard Compensation Schedule methodology for all Tenet hospitals . . . under such terms and in such format as agreed to between the parties. . . .

> 2.  The parties intend that such National Agreement will be completed and will be agreed to between the parties for all participating Tenet hospitals by September 1, 2007 and effective January 1, 2008 . . .

The Master Agreement addressed a contingency of failure to enter into a National Agreement:

> Should the parties fail to enter into a National Agreement by January 1, 2008, the current Tenet hospital service agreements and other agreements will remain in effect and the current Compensation Schedule will be amended in accordance with the changes as contemplated by Sections II, III and IV, unless otherwise agreed to by the parties.

Aetna and Tenet failed to enter into a National Agreement and thus did not enter into a universal agreement or compensation schedule prior to September 2007, as contemplated by the Master Agreement.

According to Aetna's Mr. Tanida, the Aetna PPO Agreement "must be read in conjunction with the Master Agreement," which "modifies" the Aetna PPO Agreement." Mr. Tanida explains that "the Master Agreement was to develop one contract that would provide a compensation matrix for hospitals, physicians and any free standing facilities Tenet owns" and "govern[s] the relations between Aetna and the Tenet hospitals," including DMC. Mr. Tanida notes that the "Master Agreement is explicit in its inclusion of Aetna Signature Administrators products under its existing Hospital Services Agreements."

The Master Agreement defines "Compensation Schedule" as "the schedule of rates attached to a Tenet/Aetna Service Agreement." Mr. Tanida explains that the Aetna PPO Agreement is a "Tenet/Aetna Hospital Service Agreement" and that the Hospital Services and Compensation Schedule attached to the Aetna PPO Agreement is a "Compensation Schedule." The Master Agreement provides: "With respect to Tenet hospitals that have separately negotiated percent of charge rates for the Aetna Signature Administrators program, such rates will remain in place as under such current hospital service agreement and for those that are not percent of charge rates will be paid at the PPO rates and modified as specified on Exhibit I."

Mr. Tanida notes that DMC and Aetna have not separately negotiated a percent of charge rates

1  for the ASA Plan.  Mr. Tanida concludes that "as of July 1, 2007, Aetna and [DMC] contemplated that

2  ASA products would be paid at the PPO rates set forth in the various Hospital Service Agreements,

3  including, but not limited to, the PPO Agreement."

4      Tenet's Ms. Dozier disputes that the Master Agreement alters or overrides the Aetna PPO

5  Agreement in that the Master Agreement demonstrates Tenet and Aetna Health Management, LLC's

6  "intent to negotiate the terms of a global agreement and compensation schedule that would replace their

7  individual hospital service agreements such as the Aetna PPO Agreement."  Ms. Dozier declares that

8  in the absence of a National Agreement prior to January 1, 2008, the "then-current 'Tenet hospital

9  service agreements and other agreements" remained in effect," including the Aetna PPO Agreement.

10  **MultiPlan Participating Facility Agreement With DMC**

11      Effective July 1, 2008, DMC and MultiPlan entered in the MPI Participating Facility Agreement

12  ("MultiPlan Agreement"), by which DMC claims that it became a participating health care provider in

13  MultiPlan's nationwide complementary provider network and agreed to provide medical services at

14  reduced rates for patients in healthcare plans which MultiPlan's clients, including Principal, sponsor or

15  administer.  The MultiPlan Agreement addresses "PPO Primary Network Access Requirements" and

16  states: "PPO Primary Network access, including access to PPO Primary Network Contract Rates, is

17  available only to Clients that have contracted with . . . MPI [MultiPlan] to utilize the network as the

18  Primary Network in conjunction with Programs."[5]   The MultiPlan Agreement addresses "PPO

19  Complementary Network Access Requirements" and states: "PPO Complementary Network access,

20  including access to PPO Complementary Contract Rates, is available only to Clients that have contracted

21  with MPI to utilize the Complementary Network in conjunction with Client's Programs either as an

22  extended network or when the Program does not utilize another network as primary."

23      As such, the MultiPlan Agreement provides PPO Primary Network Access and Complementary

24  Network Access, according to the declaration of Principal Compliance Analyst Sherry Ferry ("Ms.

25  Ferry").  Ms. Ferry explains that the MultiPlan Agreement "outlines that the Complementary Network

27  [5]      The MultiPlan Agreement defines "Client" to include an "employer health plan" and defines "Program"
28  to include "Benefit Program," such as a "health care plan or other health plan or program under which Participants are eligible for benefits."

7

1  is used in conjunction with Client's Programs either as an extended network or when the program does

2  not utilize another network as primary." Ms. Ferry further explains that as to the four patients at issue

3  in this action, their employer benefit plans use the ASA Plan "as the primary PPO," and DMC "is a

4  participating provider in the ASA network," thus "the Complementary Network was not applicable to

5  the claims" of the four patients.

6       DMC explains that MultiPlan's complementary network adds to primary PPO or HMO network

7  coverage by providing additional providers at discounted rates and that when participants seek care

8  outside their primary network, participants pay higher coinsurance rates but share in savings achieved

9  by the network discount. Tenet's Ms. Dozier notes that under the MultiPlan Agreement, DMC provides

10 medical services at reduced rates to MultiPlan clients, which include insurance companies, employer

11 health plans, and sponsors and administrators of health care programs which access MultiPlan's network

12 of participating health care providers. Ms. Dozier explains that since Principal is a MultiPlan client,

13 DMC is obligated under the MultiPlan Agreement to provide medical services at reduced rates to

14 patients who participate in a health plan which Principal sponsors or administers.

15      **Patients' Claims At Issue**[6]

16      In 2008, four patients received care at DMC under plans administered by Principal. Principal

17 claims that it insured neither the patients nor their plans. Principal identifies the patients as members

18 in the ASA Network.

19      Principal attributes DMC to have telephoned for benefit information for three of the patients, and

20 Principal verified that the three patients were eligible for plan benefits and "that the PPO was ASA."

21 Ms. Ferry declares that DMC "was given benefits for a primary, not complementary, PPO provider."

22 Principal claims that this automated disclaimer was provided: "Benefits quoted by an Account

23 Representative are not a guarantee of payment. Benefits are based on eligibility and plan provisions on

24 the date of service."

25      Principal's Ms. Ferry declares that Principal did not represent to DMC that the patients' treatment

26 was "covered under any of their plans" and did not "verify or discuss the PPO contracted benefit that

27  

28         [6]    The following recitation of Principal's handling of the four patient claims is derived generally from Ms. Ferry's declaration.

would be paid." Ms. Ferry characterizes verification as "nothing more than a communication of the information that coverage exists. Claims are not approved for payment until after the claim is submitted, PPO verification and pricing is completed and eligibility of the patient is verified."

Ms. Ferry explains that "the benefit plans at issue were self-funded" and that the patients' employers, not Principal, are "ultimately responsible for benefits paid" to limit Principal to ensure that claims are paid pursuant to "the correct PPO contract and eligibility information provided by the self-funded employer." Ms. Ferry notes that Principal "is not financially impacted by the amount of benefits paid."

According to Ms. Ferry, after DMC submitted claims for the four patients, "Aetna confirmed that the claims were to be paid in accordance with the PPO Agreement. Principal Life then paid the claims according to the reimbursement rates set forth in the PPO Agreement, as instructed by Aetna."

Cnythia Baccellieri ("Ms. Baccellieri") is DMC's Director of Revenue Analysis and responsible for insurance verifications and authorizations. In her declaration, Ms. Baccellieri explains that the identification cards for the four patients at issue indicated the patients were insured through Principal and that their plan was administered by Aetna Signature Administrators or the ASA Plan, with access to MultiPlan's network. According to DMC, at the patients' admission, DMC was a participating provider in MultiPlan's network, pursuant to the MultiPlan Agreement, and DMC did not participate in the ASA Plan. Ms. Baccellieri explains that Principal members were limited to MultiPlan network discounts.

Ms. Baccellieri points out that prior to the four patients' admission, DMC notified Principal that the patients would receive treatment under MultiPlan's network and that Principal verified eligibility and benefits. Ms. Baccellieri attributes to Principal no assertions that: (1) the patients were not Principal insureds; (2) Principal would not cover the patients' expenses under Principal's network arrangement with MultiPlan; or (3) the patients were eligible and treated under the ASA Plan.

### Patient 1

Patient 1 was admitted to DMC during July 25-28, 2008. On July 28, 2008, DMC asked Principal to authorize the admission. Ms. Baccellieri notes that on July 28, 2008, Principal representative Andrea verified eligibility and benefits for Patient 1. Principal notes that on July 30,

2008, Principal orally authorized a three-day stay and confirmed by a letter of that date that "this letter is not a guarantee of payment. The actual amount of benefits, if any, is subject to all policy or plan provisions in effect when services are given."

DMC submitted a $135,782 claim and expected to be paid $116,772.52 for Patient 1. Principal applied Aetna PPO Agreement reimbursement rates and paid $11,645.19 after applying Patient 1's co-payment.

On September 24, 2008, DMC informed Principal that DMC disagreed with DMC's pricing of Patient 1's claim. Principal contacted Aetna which informed Principal that the claim was priced correctly. Principal's October 7, 2008 letter informed DMC of information which Principal obtained from Aetna.

DMC's December 11, 2008 letter appealed Principal's claim decision. On January 5, 2009, Aetna confirmed that Principal had repriced Patient 1's claim correctly. Principal's January 7, 2009 letter notified DMC of Aetna's confirmation.

DMC's April 7, 2009 letter appealed the repricing of Patient 1's claim and noted that DMC "does not have a [sic] Aetna Signature Product we have our own separate agreement with Aetna." Principal's April 24, 2009 letter confirmed for DMC that Patient 1's claim was correctly paid.

The May 28, 2009 letter of DMC's counsel demanded that Principal arbitrate the claim of Patient 1 pursuant to what Principal identifies as "the contract with Aetna."[7] Principal claims that it "declined

---

[7] This Court is unsure as to which "contract" Principal refers but presumes it is the Master Agreement between Tenet and Aetna Health Management, LLC. The Master Agreement includes a disputes resolution provision, which states in part:

> 1. If a dispute arises between the parties hereto they shall first, upon written notice from the party who determines that there is a dispute, meet and in good faith attempt to resolve the matter. Both parties shall make available for such meeting appropriate personnel who are authorized to make such decisions as are necessary to resolve the dispute.

> 2. If the matter is not resolved within thirty (30) days of a party's written request for negotiation (including any dispute related to the Auditor hereunder), either party may initiate arbitration by providing written notice to the other party. Any controversy or claim arising out of or relating to this Agreement or the breach, termination, or validity thereof . . . shall be settled by binding arbitration administered by the American Arbitration Association ("AAA") and conducted by a sole Arbitrator ("Arbitrator") in accordance with AAA's Commercial Arbitration Rules ("Rules"). The arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-16, to the exclusion of state laws inconsistent therewith or that would produce a different result, and judgment on the award rendered by the Arbitrator (the "Award") may be entered by any court having jurisdiction thereof. . . .

1   to participate in arbitration on the basis that it is not a party to [DMC's] contract with Aetna and,

2   therefore, is not a proper party to any arbitration."

3                                    ***Patient 2***

4          Patient 2 was admitted to DMC during December 1-3, 2008.  Principal notes that "[b]enefits

5   were verified on November 24, 2008."  On January 30, 2009, DMC submitted a $46,108.97 claim and

6   expected to be paid $39,653.71 for Patient 2.  Principal applied Aetna PPO Agreement reimbursement

7   rates, paid DMC $5,095.03, and notified DMC that "the charge was reduced per the contractual

8   agreement with Aetna offered through Aetna Signature Administrators."

9          DMC's May 4, 2009 letter appealed the pricing and stated that DMC "does not have an Aetna

10  Signature product.  According to our contract with Principal Life/MultiPlan inpatient services are to be

11  reimbursed at 86% of total charges."

12         On June 8, 2009, DMC telephoned Principal to claim that DMC is "non-par with ASA."  On that

13  same date, Principal confirmed with Aetna that DMC is a participating provider and so notified DMC

14  on June 25, 2009.

15         Principal's July 20, 2009 letter informed DMC that Principal had overpaid Patient 2's claim by

16  $429.13 because the claim was initially priced incorrectly and requested DMC's $429.13 payment.

17                                   ***Patient 3***

18         Patient 3 was admitted to DMC December 29-30, 2008.  On December 29, 2008, Principal

19  sought Principal's preauthorization to admit Patient 3.  Principal informed DMC that no authorization

20  was required.

21         DMC submitted a $19,514.60 claim and expected to be paid $16,782.56 for Patient 3.  Principal

22  applied Aetna PPO Agreement reimbursement rates, paid "the contracted ASA contracted rate of

23  $10,195.57," and notified DMC that "the charge was reduced per the contractual agreement with Aetna

24  offered through Aetna Signature Administrators."

25         On March 6, 2009, DMC appealed the amount paid for Patient 3 and requested further payment

26  pursuant to the MultiPlan Agreement.  On May 4, 2009, Principal informed DMC that Aetna verified

27

28

1    that DMC was a participating provider and that the appeal was denied.  Principal's May 19, 2009 letter

2    claimed a $4,396 overpayment of Patient 3's claim and demanded DMC to pay that amount.

3                                          ***Patient 4***

4         On August 31, 2008, Patient 4 presented to the DMC emergency room and was admitted to

5    DMC.  Principal did not preauthorize the admission and gave no authorization number.  DMC notes that

6    since Patient 4 was an emergency admission, "no verification of insurance eligibility or benefits could

7    be completed prior to provision of medical services."

8         On September 13, 2008, DMC submitted a $24,502.27 claim and expected to be paid $21,234.66

9    for Patient 4.  Principal applied the PPO Agreement reimbursement rates, allowed $3,033.94, paid

10   $2,407.16, and notified DMC that "the charge was reduced per the contractual agreement with Aetna

11   offered through Aetna Signature Administrators."

12        DMC's October 21, 2008 and May 29, 2009 letters appealed Patient 4's reimbursement.

13   Principal's June 18, 2009 letter informed DMC that ASA, not MultiPlan, was the applicable PPO

14   network and that the allowable reimbursement was $2,375.70 per ASA to result in a $31.46 overpayment

15   to DMC.

16                        **Aetna/Tenet Settlement Agreement**

17        Tenet, "on behalf of itself and its owned or hospital affiliates," entered into an April 8, 2010

18   Settlement Agreement ("Settlement Agreement") with Aetna Health Management, LLC, "on behalf of

19   itself and its affiliates."  Aetna's Mr. Tanida explains that the "Settlement Agreement resolved all

20   disputes between Aetna and Tenet regarding assertions that claims had not been properly paid pursuant

21   to the terms of various Hospital Agreements for all claims prior to and including December 31, 2008."

22        The Settlement Agreement applies to all hospital facilities listed on its Exhibit A, including

23   DMC.  Pursuant to the Settlement Agreement, Aetna Health Management, LLC agreed to pay Tenet a

24   confidential amount.  The Settlement Agreement provides: "Tenet and Aetna further agree that as part

25   of this Settlement, and after said payment identified above, neither party shall seek overpayment or

26   underpayment recovery, including any prompt pay penalty, for any Disputed Claim."

27        The Settlement Agreement includes the following release:

28        In consideration of Aetna's and Tenet's execution and delivery of this Settlement

                                              12

Agreement and settlement check, the Parties do hereby release and forever discharge each other and each other's respective officers, directors, employees and other agents from any and all actions, causes of action, suits, debts, accounts, damages, judgments, claims and demands whatsoever, whether at law or in equity, whether known or unknown, which Aetna or Tenet ever had, now have or may or might in the future have against the other or against any of the entities or individuals hereby released, which relate to, or arise out of the Dispute. The Parties do not intend this release and discharge to have any affect on any claims other than those Disputed Claims which fall within the Dispute Period.

Mr. Tanida declares that "Aetna considers Principal Life an agent pursuant to the Network Agreement" between Principal and Aetna Life. According to Mr. Tanida, DMC raises in this action claims subject to the Settlement Agreement and its Dispute Period in that DMC "claims to have been underpaid for claims, and those claims arise under the PPO Agreement."

Tenet's Ms. Dozier characterizes the Settlement Agreement to have "resolved various disputes between Aetna and Tenet" but not those at issue in this action. Ms. Dozier notes that "the Settlement Agreement did not relate to, or resolve, any disputes or claims arising out of Doctors Medical's agreement with MultiPlan, or Doctors Medical Center's provision of medical services under MultiPlan's complementary network."

## DMC Claims

DMC proceeds on its Complaint for Damages ("complaint") to pursue claims, which will addressed below, for breach of contract, breach of implied contract, quantum meruit, and negligent misrepresentation due to Principal's failure to pay the four patient claims based on rates under the MultiPlan Agreement, which DMC claims is controlling. DMC seeks $161,562.42 on its breach of contract claims, and alternatively, $193,216.01 on its other claims.

The parties agree that the gist of this dispute is whether rates under the Aetna PPO Agreement or MultiPlan Agreement control. Principal construes this dispute as between Principal and Aetna in that Principal is not a party to the applicable Aetna PPO Agreement and is merely the "third-party administrator for the self-funded employer health plans participating in the Aetna Signature Administrators PPO network." Principal contends that it is "not a proper party to this action" in that "Aetna had the sole authority to price the claims and the employer plans were ultimately responsible for payments of benefits." Principal further claims that the Settlement Agreement bars DMC's claims in that DMC is bound to it through its parent company Tenet.

1    DMC contends that the four patients were covered under the MultiPlan and ASA networks and

2    that since DMC did not agree to participate in the ASA Plan at the time of the patients' admissions, the

3    patients received treatment under the MultiPlan network and under the MultiPlan Agreement rates.  In

4    short, DMC argues that the MultiPlan Agreement controls the parties' dispute.

5    **DISCUSSION**

6    **Summary Judgment Standards**

7    Principal seeks summary judgment in that:

8    1.    The Aetna PPO Agreement controls to bar DMC's breach of contract claims based on

9          the MultiPlan Agreement;

10   2.    The Aetna PPO Agreement is a valid express contract to bar DMC's implied-in-fact and

11         quasi-contract claims; and

12   3.    DMC is unable to establish negligent misrepresentation elements of Principal's assertion

13         that benefits would be paid and DMC's justifiable reliance on Principal's verification of

14         benefits.

15   F.R.Civ.P. 56(a) permits a party to seek summary judgment "identifying each claim or defense

16   – or the part of each claim or defense – on which summary judgment is sought."[8]  "A district court may

17   dispose of a particular claim or defense by summary judgment when one of the parties is entitled to

18   judgment as a matter of law on that claim or defense." *Beal Bank, SSB v. Pittorino*, 177 F.3d 65, 68 (1st

19   Cir. 1999).

20   Summary judgment is appropriate when the movant shows "there is no genuine dispute as to any

21   material fact and the movant is entitled to judgment as a matter of law."  F.R.Civ.P. 56(a); *Matsushita*

22   *Elec. Indus. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356 (1986); *T.W. Elec. Serv.,*

23   *Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). The purpose of summary

24   judgment is to "pierce the pleadings and assess the proof in order to see whether there is a genuine need

25   for trial." *Matsushita Elec.,* 475 U.S. at 586, n. 11, 106 S.Ct. 1348; *International Union of Bricklayers*

26   *v. Martin Jaska, Inc.*, 752 F.2d 1401, 1405 (9th Cir. 1985).

27
28       [8]    Principal's papers reference California Code of Civil Procedure section 437c is inapplicable as this action
         proceeds in federal court.

On summary judgment, a court must decide whether there is a "genuine issue as to any material fact," not weigh the evidence or determine the truth of contested matters.  F.R.Civ.P. 56(a), (c); *Covey v. Hollydale Mobilehome Estates*, 116 F.3d 830, 834 (9th Cir. 1997); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598 (1970); *Poller v. Columbia Broadcast System*, 368 U.S. 464, 467, 82 S.Ct. 486 (1962); *Loehr v. Ventura County Community College Dist.*, 743 F.2d 1310, 1313 (9th Cir. 1984).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505 (1986)

The evidence of the party opposing summary judgment is to be believed and all reasonable inferences that may be drawn from the facts before the court must be drawn in favor of the opposing party.  *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505; *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.  The inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252, 106 S.Ct. 2505.

To carry its burden of production on summary judgment, a moving party "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000); *see High Tech Gays v. Defense Indus. Sec. Clearance Office*, 895 F.2d 563, 574 (9th Cir. 1990). "[T]o carry its ultimate burden of persuasion on the motion, the moving party must persuade the court that there is no genuine issue of material fact." *Nissan Fire*, 210 F.3d at 1102; *see High Tech Gays*, 895 F.2d at 574.  "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial." *Nissan Fire*, 210 F.3d at 1102-1103; *see Adickes*, 398 U.S. at 160, 90 S.Ct. 1598.

15

1    "If, however, a moving party carries its burden of production, the nonmoving party must produce

2    evidence to support its claim or defense." *Nissan Fire*, 210 F.3d at 1103; *see High Tech Gays*, 895 F.2d

3    at 574.  "If the nonmoving party fails to produce enough evidence to create a genuine issue of material

4    fact, the moving party wins the motion for summary judgment."  *Nissan Fire*, 210 F.3d at 1103; *see*

5    *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548 (1986) (F.R.Civ.P. 56 "mandates the entry

6    of summary judgment, after adequate time for discovery and upon motion, against a party who fails to

7    make the showing sufficient to establish the existence of an element essential to that party's case, and

8    on which that party will bear the burden of proof at trial.")

9          "But if the nonmoving party produces enough evidence to create a genuine issue of material fact,

10   the nonmoving party defeats the motion."  *Nissan Fire*, 210 F.3d at 1103; *see Celotex*, 477 U.S. at 322,

11   106 S.Ct. 2548.  "The amount of evidence necessary to raise a genuine issue of material fact is enough

12   'to require a jury or judge to resolve the parties' differing versions of the truth at trial.'"  *Aydin Corp.*

13   *v. Loral Corp.*, 718 F.2d 897, 902 (quoting *First Nat'l Bank v. Cities Service Co.*, 391 U.S. 253, 288-

14   289, 88 S.Ct. 1575, 1592 (1968)).  "The mere existence of a scintilla of evidence in support of the

15   plaintiff's position will be insufficient."  *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505.

16         Under F.R.Civ.P. 56(g), a summary judgment/adjudication motion, interlocutory in character,

17   may be rendered on the issue of liability alone.  "In cases that involve . . . multiple causes of action,

18   summary judgment may be proper as to some causes of action but not as to others, or as to some issues

19   but not as to others, or as to some parties, but not as to others." *Barker v. Norman*, 651 F.2d 1107, 1123

20   (5th Cir. 1981); *see also Robi v. Five Platters, Inc.*, 918 F.2d 1439 (9th Cir. 1990); *Cheng v.*

21   *Commissioner Internal Revenue Service*, 878 F.2d 306, 309 (9th Cir. 1989).  A court "may grant

22   summary adjudication as to specific issues if it will narrow the issues for trial." *First Nat'l Ins. Co. v.*

23   *F.D.I.C.*, 977 F.Supp. 1051, 1055 (S.D. Cal. 1977).

24         As discussed below, DMC has raised factual issues as to all of its claims but one to necessitate

25   trial.

26                                 **Breach Of Contract**

27         The complaint's first through fourth claims allege that Principal breached the MultiPlan

28   Agreement by incorrectly adjusting payment and underpaying claims for the four patients by

                                          16

1   $161,562.42.  The claims further allege that Principal breached the MultiPlan Agreement by "refusing

2   to pay the full amount due under its terms."

3      "The standard elements of a claim for breach of contract are: '(1) the contract, (2) plaintiff's

4   performance or excuse for nonperformance, (3) defendant's breach, and (4) damage to plaintiff

5   therefrom.'"   *Wall Street Network, Ltd. v. New York Times Co.*, 164 Cal.App.4th 1171, 1178, 80

6   Cal.Rptr.3d 6 (2008).  "To form a contract, an 'offer must be sufficiently definite . . . that the

7   performance promised is reasonably certain.'"   *Alexander v. Codemasters Group Limited*, 104

8   Cal.App.4th 129, 141. 127 Cal.Rptr.2d 145 (2002).

9                                    ***Aetna PPO Agreement's Effects***

10      Principal contends that the Aetna PPO Agreement "governed" amounts owed to DMC and that

11   Principal undisputably paid required amounts under the Aetna PPO Agreement.  Principal argues that

12   DMC misapplies the MultiPlan Agreement in that the Aetna PPO Agreement governs "the services

13   provided to Members of the ASA Network, including the Patients."  Principal explains that the Aetna

14   PPO Agreement is an "all products contract" and that its Participation Schedule defines Plans in which

15   DMC agreed to participate and includes ASA.  Principal points to Aetna Insurance Company's Mr.

16   Tanida's declaration that "[n]othing in the negotiations between Aetna and [DMC], nor the actual PPO

17   Agreement excludes ASA products."

18      Principal challenges DMC's claim that the Aetna PPO Agreement allows only Aetna entities

19   which are listed as Affiliates to participate in discounts.  Principal points out that ASA is an Aetna PPO

20   network or product, not an Aetna-owned corporation, partnership, affiliate or other legal entity.

21   Principal points to "Aetna Signature Administrators" as a registered service mark owned by Aetna, Inc.,

22   the parent company of Aetna Health of California, Inc. and Aetna Health Management, Inc.

23      DMC argues that the Aetna PPO Agreement and its Product Participation Schedule reflect that

24   DMC did not participate in the ASA Plan in 2008, when the patients were treated.  DMC notes that it

25   provided reduced rates only to patients who participated in Aetna plans specifically "listed" in the Aetna

26   PPO Agreement.  DMC relies on the Aetna PPO Agreement's "Plan Participation" provision by which

27   DMC "agrees to participate in the Plans and other health benefit products **listed** on the Product

28   Participation Schedule attached hereto and made a part hereof."  (Bold added.)  DMC points to the

1    Product Participation Schedule's limited reference to "PPO and NAP Plans . . . Including, but not limited

2    to . . . Open Choice and National Advantage and any Aetna Health Fund product built off the PPO and

3    NAP platform."   DMC argues that the Plan Participation provision and Plan Participation Schedule

4    reveal that the Aetna PPO Agreement is not an "all products contract."

5         DMC futher points to the Aetna PPO Agreement's "Introduction of New Plans and Products"

6    provision as "a mechanism for Aetna to add new products" and which provides that if Aetna and DMC

7    "cannot reach agreement on new rates for the new plans or products, the terms of this Agreement shall

8    not apply to [DMC] services provided to Members enrolled in such new Plans or products."   DMC

9    points to Ms. Dozier's declaration that Aetna neither provided DMC with "written notice of such new

10   Plans and Products and the associated compensation" for the ASA Plan nor introduced and designated

11   the ASA Plan as required under the Introduction of New Plans and Products provision.

12        DMC continues that the ASA Plan's addition by the 2010 Amendment to the Aetna PPO

13   Agreement demonstrates that DMC did not participate in the ASA Plan when it treated the patients in

14   2008.   DMC concludes that "there would be no need to add the ASA Plan if it were already part of the

15   agreement."

16        In its reply papers, Principal responds that the Product Participation Schedule's "including, but

17   not limited to" language was broad enough to cover the ASA Plan to demonstrate that the Aetna PPO

18   Agreement is an "all products contract."   Principal further notes that the ASA Plan was "an existing

19   product," not a "new plan or product introduced by Aetna during the pendency of the PPO Agreement."

20        This Court agrees with DMC's analysis of the Aetna PPO Agreement.   At a minimum, DMC

21   creates factual challenges whether the Aetna PPO Agreement controls.   Principal offers nothing

22   meaningful to support that the Aetna PPO Agreement is an "all products contract" and itself raises

23   factual issues as to, among other things, whether the "including, but not limited to" language was broad

24   enough to cover the ASA Plan.   The 2010 Amendment belies such notion given the 2010 Amendment's

25   explicit addition of the ASA Plan.   The 2010 Amendment replaced the Aetna PPO Agreement's Product

26   Participation Schedule and Hospital Compensation Schedule, the result of which was to include

27   expressly for the first time the ASA Plan as a "Non-Gated Health Benefit Product" to be paid "according

28   to the Services and Compensation Schedules attached to this Agreement."   Principal's points as to other

impacts of the 2010 Amendment are immaterial and unavailing, and its claim that "[b]eing a PPO Plan, ASA fell within this general description" of the Product Participation Schedule reiterates factual issues as to interpretation of the Aetna PPO Agreement, the Product Participation Schedule and the 2010 Amendment.

### *Master Agreement Modification*

Principal urges to read the Aetna PPO Agreement as modified by the Master Agreement between Aetna Health Management, LLC and Tenet, DMC's parent corporation. Principal points to Mr. Tanida's declaration that the Master Agreement "continues to govern relations between Aetna and the Tenet hospitals," including DMC and that the "Master Agreement is explicit in its inclusion of Aetna Signature Administrators products under its existing Hospital Services Agreements," including the Aetna PPO Agreement. Principal explains that since DMC lacks a "separately negotiated percent of charge rates" for ASA, ASA products "are to be paid at the PPO rates set forth in the PPO Agreement."

DMC accuses Principal of "exploiting the multifaceted structure of health care contracts to create confusion as to which PPO network contract applies to the services at issue." DMC raises an initial challenge to the Master Agreement based on the parol evidence rule.

### The Parol Evidence Rule

The Aetna PPO Agreement includes an integration clause that the Aetna PPO Agreement "is the complete and sole contract between the parties" and "supersedes any and all prior or contemporaneous oral or written communications or proposals not expressly included herein." DMC argues that applying the Master Agreement to the Aetna PPO Agreement is "inconsistent" with the Aetna PPO Agreement and its integration clause.

Principal responds that the Master Agreement may be considered to interpret the Aetna PPO Agreement because the Master Agreement does not alter the Aetna PPO Agreement's terms and proves a meaning to which the Aetna PPO Agreement is reasonably susceptible. Principal contends that failure to designate "every conceivable Aetna product in the [Aetna PPO Agreement's] Product Participation Schedule does not limit the scope of the PPO Agreement."

The parol evidence rule "generally prohibits the introduction of any extrinsic evidence, whether oral or written, to vary, alter or add to the terms of an integrated written instrument." *Alling v. Universal*

19

*Manufacturing Corp.,* 5 Cal.App.4th 1412, 1433, 7 Cal.Rptr.2d 718 (1992). However, "[e]xtrinsic evidence is 'admissible to interpret the instrument, but not to give it a meaning to which it is not susceptible' . . ., and it is the instrument itself that must be given effect." *City of Manhattan Beach v. Superior Court,* 13 Cal.4th 232, 238, 914 P.2d 160 (1996), *cert. denied*, 519 U.S. 1008, 117 S.Ct. 511 (1996).

In *Casa Herrera, Inc. v. Beydoun*, 32 Cal.4th 336, 344, 9 Cal.Rptr.3d 97 (2004), the California Supreme Court explained effects of the parol evidence rule:

> The parol evidence rule therefore establishes that the terms contained in an integrated written agreement may not be contradicted by prior or contemporaneous agreements. In doing so, the rule necessarily bars consideration of extrinsic evidence of prior or contemporaneous negotiations or agreements at variance with the written agreement. "[A]s a matter of substantive law such evidence cannot serve to create or alter the obligations under the instrument." (*Tahoe National Bank v. Phillips* (1971) 4 Cal.3d 11, 23, 92 Cal.Rptr. 704, 480 P.2d 320 . . .) In other words, the evidentiary consequences of the rule follow from its substantive component—which establishes, as a matter of law, the enforceable and incontrovertible terms of an integrated written agreement.

The parol evidence rule "applies to any type of contract, and its purpose is to make sure that the parties' final understanding, deliberately expressed in writing, shall not be changed." *Casa Herrera*, 32 Cal.4th at 346, 9 Cal.Rptr.3d 97 (citation omitted).

Application of the parol evidence rule rests on whether "the writing [was] intended to be an integration, i.e., a complete and final expression of the parties' agreement, precluding any evidence of collateral agreements [citation]; and 2) . . . the agreement [is] susceptible of the meaning contended for by the party offering the evidence?" *Banco Do Brasil, S.A. v. Latian, Inc.*,234 Cal.App.3d 973, 1001, 285 Cal.Rptr. 870 (1992) (internal quotation marks omitted). The parol evidence rule does not prohibit the introduction of extrinsic evidence "to explain the meaning of a written contract . . . [if] the meaning urged is one to which the written contract terms are reasonably susceptible." *BMW of North America, Inc. v. New Motor Vehicle Bd.,*162 Cal.App.3d 980, 990, fn. 4, 209 Cal.Rptr. 50 (1984). The "test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." *Pacific Gas & E. Co. v. G. W. Thomas Drayage*, 69 Cal.2d 33, 37, 69 Cal.Rptr. 561 (1968).

The Aetna PPO Agreement's integration clause reflects that the Aetna PPO Agreement is

20

intended as a complete, final expression of the agreement, to that point, of DMC, Aetna Health of California, Inc. and Aetna Health Management, Inc.  At a minimum, the integration clause raises factual challenges as to Principal's explanation that the Master Agreement clarified that in the absence of a National Agreement, ASA products would be paid at Aetna PPO Agreement rates.  Nothing in the record suggests that the Master Agreement overrides the Aetna PPO Agreement's integration clause or that the Aetna PPO Agreement requires extrinsic evidence to explain it, despite DMC's acceptance of unrelated benefits under the Master Agreement.

Agreement To Agree

DMC characterizes the Master Agreement as an unenforceable "agreement to agree" or "agreement to negotiate."  "The general rule is that if an 'essential element' of a promise is reserved for the future agreement of both parties, the promise gives rise to no legal obligation until such future agreement is made."  *City of Los Angeles v. Superior Court of Los Angeles County*, 51 Cal.2d 423, 433, 333 P.2d 745 (1959).

DMC points to Master Agreement provisions that the "parties agree to enter into a National Agreement . . . and a standard Compensation Schedule methodology for all Tenet hospitals . . . under such terms and in such format as agreed to between the parties" and that the "parties intend that such National Agreement will be completed and will be agreed to between the parties for all participating Tenet hospitals by September 1, 2007."  DMC attributes the Master Agreement to express Tenet and Aetna Healthcare Management, LLC's desire to accomplish future arrangements to render it unenforceable as to DMC's treatment of the four patients.

DMC raises valid points.  The Master Agreement reflects intentions to reach a National Agreement and Compensation Schedule subject to future negotiations.  Principal fails to demonstrate viable application of the Master Agreement to the issues at hand, especially given the factual issues raised by DMC.

No Obligation To Participate In ASA Plan

DMC interprets the Master Agreement to the effect that the Aetna PPO Agreement remained effective until Tenet and Aetna Health Management, LLC replaced or amended the Aetna PPO Agreement.  DMC notes that since the Aetna PPO Agreement was not amended until 2010, the Aetna

PPO Agreement's original terms, without ASA Plan obligations, remained in effect at the time of the four patients' admissions. To reflect intentions to negotiate replacement of the Aetna PPO Agreement, DMC points to the Master Agreement's "Failure to Meet Deadlines" provision: "Should the parties fail to enter into a National Agreement by January 1, 2008, the current Tenet hospital service agreements and other agreements will remain in effect and the current Compensation Schedule will be amended . . ." DMC explains that since Tenet and Aetna Health Management, LLC failed to "enter into a National Agreement by January 1, 2008," the then-current "Tenet hospital service agreements and other agreements" remained in effect. As such, DMC notes that the Aetna PPO Agreement, without ASA Plan obligations, would not have needed amending if the Master Agreement actually modified it as Principal contends.

DMC's analysis of the Master Agreement raises factual issues as to its effect and whether DMC was subject to ASA Plan obligations.

### *MultiPlan Agreement Effects*

DMC argues that the MultiPlan Agreement sets rates for the four patients' care in that DMC did not participate in the ASA Plan during the patients' admissions and thus could not be treated under the ASA Plan. DMC notes that DMC and Principal participated in MultiPlan's network and thus the patients were treated under the only available network, MultiPlan. As such, DMC holds Principal to pay MultiPlan Agreement rates.

DMC's takes a "process of elimination" approach. In other words, since the Aetna PPO Agreement and Master Agreement do not apply, the only available option is the MultiPlan Agreement. DMC's approach makes sense. At a minimum, DMC has raised factual issues as to the governing and modifying effects of the Aetna PPO and Master Agreement to withstand summary judgment on DMC's breach of contract claims.

### **Quasi-Contract Claims**

The complaint's fifth through eighth claims allege that "[b]y providing authorization to DMC Modesto, Principal promised to pay for the expenses incurred by DMC Modesto in its care and treatment of its insured, creating an implied contract." The claims continue that "Principal breached its implied agreement with DMC Modesto by refusing to pay DMC Modesto's claim for the charges incurred" for

the four patients.

The complaint's thirteenth through sixteenth quantum meruit claims allege that by representing to DMC that it should care for the four patients, Principal "expressly and impliedly requested that DMC Modesto provide care and treatment" to the four patients. The claims further allege that DMC's treatment of the four patients benefitted Principal in that the patients received treatment "which Principal was obligated to provide."

Principal characterizes the complaint's breach of implied contract and quantum meruit claims as "quasi contract" and barred by the express Aetna PPO Agreement or MultiPlan Agreement.

### *Existence Of Binding Agreement*

"[A]s a matter of law, a quasi-contract action for unjust enrichment does not lie where, as here, express binding agreements exist and define the parties' rights." *California Medical Ass'n, Inc. v. Aetna U.S. Healthcare of California, Inc.,* 94 Cal.App.4th 151, 172, 114 Cal.Rptr.2d 109 (2001). "When parties have an actual contract covering a subject, a court cannot – not even under the guise of equity jurisprudence – substitute the court's own concepts of fairness regarding that subject in place of the parties' own contract." *Hedging Concepts, Inc. v. First Alliance Mortgage Co.,* 41 Cal.App.4th 1410, 1419-1420, 49 Cal.Rptr.2d 191 (1996).

In *Hedging Concepts*, 41 Cal.App.4th at 1419, 49 Cal.Rptr.2d 191, the California Court of Appeal explained limits to quantum meruit or quasi-contract recovery:

> A quantum meruit or quasi-contractual recovery rests upon the equitable theory that a contract to pay for services rendered is implied by law for reasons of justice. . . . However, it is well settled that there is no equitable basis for an implied-in-law promise to pay reasonable value when the parties have an actual agreement covering compensation. . . .
>
> Quantum meruit is an equitable theory which supplies, by implication and in furtherance of equity, implicitly missing contractual terms. Contractual terms regarding a subject are not implicitly missing when the parties have agreed on express terms regarding that subject. A quantum meruit analysis cannot supply "missing" terms that are not missing. "The reason for the rule is simply that where the parties have freely, fairly and voluntarily bargained for certain benefits in exchange for undertaking certain obligations, it would be inequitable to imply a different liability. . . ." *Wal-Noon Corp. v. Hill* (1975) 45 Cal.App.3d 605, 613, 119 Cal.Rptr. 646.

"There cannot be a valid, express contract and an implied contract, each embracing the same subject matter, existing at the same time." *Wal-Noon Corp. v. Hill*, 45 Cal.App.3d 605, 613, 119

23

1    Cal.Rptr. 646 (1975).

2         Principal contends that the "subject matter" of the complaint's implied contract and quantum

3    meruit claims is the "amount of compensation" which DMC is entitled from Principal and "is governed

4    by one of the express contracts alleged by the parties." Principal notes that DMC acknowledges that

5    written contracts govern "the manner in which it is to receive compensation from Principal" given

6    DMC's reliance on MultiPlan Agreement rates. Principal continues that this Court is unable to supply

7    "missing terms" in that the Aetna PPO Agreement and MultiPlan Agreement set rates. Principal further

8    notes that since the complaint fails to allege a voided or rescinded contract, DMC lacks quasi-contract

9    claims.

10        DMC responds that Principal "misapprehends" the nature of DMC's breach of implied contract

11   and quantum meruit claims, pled in the alternative under F.R.Civ.P. 8(d)(2) and (3). DMC continues

12   that Principal "misapplies the governing law" in that "existence of an enforceable contract between

13   parties will prevent recovery in quasi-contract, as between those parties." DMC points to the absence

14   of an agreement directly between it and Principal in that DMC entered the Aetna PPO Agreement with

15   Aetna Health of California, Inc. and Aetna Health Management, Inc. and entered the MultiPlan

16   Agreement with MultiPlan. DMC concludes that in the absence of its contract with Principal, the

17   "rationale underlying the rule disappears."

18        DMC raises valid points, especially considering factual issues as to which agreement sets DMC's

19   rates for the four patients. Potential exists that a factfinder may conclude that neither the Aetna PPO

20   Agreement nor MultiPlan Agreement apply to leave no binding agreement which would bar DMC's

21   quasi-contract claims. If there is no binding agreement, the factfinder will need a means to supply

22   missing terms. Although this Court is not prepared to conclude the absolute absence of a binding

23   express agreement, it must be prepared to face such potential at trial. Principal is unable to prevail on

24   its contentions that a binding agreement bars DMC's quasi-contract claims.

25                                  ***Coverage Verification***

26        Principal argues that its verification of coverage for the four patients does not establish a binding

27   oral contract. DMC responds that it seeks to recover on an implied, not an oral, contract.

28        Essential elements to contract existence are: (1) "[p]arties capable of contracting;" (2) "[t]heir

                                                      24

consent;" (3) a "lawful object;" and (4) a "sufficient cause or consideration."  Cal. Civ. Code, § 1550.

"[C]reation of a valid contract requires mutual assent. . . .  Parties must communicate their mutual consent to enter into a contract."  *Rennick v. O.P.T.I.O.N. Care, Inc.*, 77 F.3d 309, 315 (9th Cir. 1996) (citing Cal. Civ. Code, §§ 1550, 1565).  The California Court of Appeal has explained:

> One of the essential elements of a contract is the consent of the parties. (Civ. Code, § 1550.) This consent must be mutual. (Civ. Code, § 1565.) "Consent is not mutual, unless the parties all agree upon the same thing in the same sense. (Civ. Code, § 1580.) It is only on evidence of such consent that the law enforces the terms of a contract or gives a remedy for the breach of it. One cannot be made to stand on a contract to which he has never consented." (*Amer. Aero. Corp. v. Grand Cen. Aircraft Co.* (1957) 155 Cal.App.2d 69, 79, 317 P.2d 694.)

*Khajavi v. Feather River Anesthesia Medical Group*, 84 Cal.App.4th 32, 60, 100 Cal.Rptr.2d 627 (2000) ("a party is entitled to the benefit of only those provisions to which the contracting parties agreed, not the ones to which they might have subsequently agreed").

Principal explains that no oral contract to pay for patient treatment arises when a healthcare provider obtains telephone verification of the patient's coverage from a health insurer.  *See Cedars Sinai Medical Center v. Mid-West Nat. Life Ins. Co.,* 118 F.Supp.2d 1002, 1008 (C.D. Cal. 2000) ("within the medical insurance industry, an insurer's verification is not the same as a promise to pay"); *see also Tenet Healthsystem Desert, Inc. v. Fortis Ins. Co., Inc.*, 520 F.Supp.2d 1184, 1194 (C.D. Cal. 2007) (coverage verification "cannot be construed as a binding contractual agreement").

Principal argues that DMC is unable to establish Principal's intent to contract with DMC "for payment of full billed charges when it verified that the Patients were eligible for benefits" in that Principal did not discuss the PPO contract benefit to be paid for the patients.  Principal points to its Compliance Analyst Ms. Ferry's declaration that Principal telephone representatives "are not authorized to provide claim approvals" and Principal's practice is that "a verification is nothing more than a communication of the information that coverage exists.  Claims are not approved for payment until after the claim is submitted, PPO verification and pricing is completed and eligibility of the patient is verified."

DMC responds that a meeting of the minds as to amounts which it would be paid was not required in that DMC and Principal's acts and conduct manifested "their assent to contract."  "An 'implied-in-law' contract is actually not a contract at all, but merely an obligation imposed by the law

25

1  to bring about justice. It has been held that a contract may be formed even though there is no 'meeting

2  of the minds.'"  *Arcade County Water Dist. v. Arcade Fire Dist.*, 6 Cal.App.3d 232, 236, 85 Cal.Rptr.

3  737 (1970).  "In California, a party's intent to contract is judged objectively, by the party's outward

4  manifestation of consent." *Weddington Productions, Inc. v. Flick*, 60 Cal.App.4th 793, 811, 71

5  Cal.Rptr.2d 265 (1998).  "Whether or not an implied contract has been created is determined by the act

6  and conduct of the parties and all the surrounding circumstances involved and is a question of fact." *Del*

7  *E. Webb Corp. v. Structural Materials Co.*, 123 Cal.App.3d 593, 611, 176 Cal.Rptr. 824 (1981).

8        At a minimum, the record creates factual issues as to what the parties intended.  Although

9  Principal did not verify payment amounts, it verified the four patient's coverage which DMC attributes

10  to have been under the MultiPlan network.  The record raises factual issues as to whether Principal,

11  through its acts and conduct, no less than implied that DMC would be paid at MultiPlan network rates.

12  The record's absence of clarity prevents summary judgment in Principal's favor on the breach of implied

13  contract and quantum meruit claims.

14                    **Negligent Misrepresentation**

15        The complaint's ninth through twelfth negligent misrepresentation claims allege that Principal's

16  verification of the four patients' eligibility, benefits and authorization was an untrue representation that

17  Principal would cover the patients' treatment.

18        Principal challenges DMC's evidence to support negligent misrepresentation elements.

19        The elements of negligent misrepresentation are (1) the misrepresentation of a past or existing

20  material fact, (2) without reasonable ground for believing it to be true, (3) with intent to induce another's

21  reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting

22  damage.  *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 158 Cal.App.4th 226, 243, 70

23  Cal.Rptr.3d 199 (2007).  In contrast to fraud, negligent misrepresentation does not require knowledge

24  of falsity. *Apollo Capital*, 158 Cal.App.4th at 243, 70 Cal.Rptr.3d 199.  A defendant who makes false

25  statements "'honestly believing that they are true, but without reasonable ground for such belief, . . . may

26  be liable for negligent misrepresentation.'"  *Bily v. Arthur Young & Co.*, 3 Cal.4th 370, 407, 11

27  Cal.Rptr.2d 51 (1992) (citation omitted).  "However, a positive assertion is required; an omission or an

28  implied assertion or representation is not sufficient." *Apollo Capital*, 158 Cal.App.4th at 243, 70

                              26

1    Cal.Rptr.3d 199.

2                              *Positive Assertions*

3          Principal challenges DMC's ability to establish "a positive assertion of the exact amount of

4    benefits that would be paid." Principal points to the complaint's allegations that "Principal confirmed

5    that no authorization was required" for requested services for these patients. Principal notes that it did

6    not misrepresent the patients' benefits eligibility and that as a third-party administrator, it could not

7    represent payment amounts in that Principal lacked "responsibility" to make payments. Principal points

8    to its "automated disclaimer" that quoted benefits "are not a guarantee of payment" and that "benefits

9    are based on eligibility and plan provisions on the date of service." Principal argues that an "implied"

10   verification that benefits would be paid in a specific amount fails to satisfy the "positive assertion"

11   requirement for negligent misrepresentation.

12         DMC responds that it need not show that Principal represented the exact amount of benefits to

13   be paid in that DMC's burden is to establish "the misrepresentation of a past or existing fact." *Apollo

14   Capital*, 158 Cal.App.4th at 243, 70 Cal.Rptr.3d 199. DMC claims there are triable factual issues as to

15   Principal's "requisite misrepresentations" in that:

16         1.    The Principal-issued insurance cards indicated that the patients were insured through

17               Principal with access to MultiPlan's network;

18         2.    DMC notified Principal that the patients would receive care under MultiPlan's network;

19         3.    Principal verified the patient's eligibility and benefits; and

20         4.    Principal did not notify DMC that the patients were treated under the ASA Plan.

21   DMC argues that if the patients were ineligible under the MultiPlan network, "the contrary statements

22   made at the time the patients were admitted were misrepresentations of past or existing fact."

23         Discrepancies exist in the parties' versions of information provided by Principal at the patients'

24   admissions. Principal contends it communicated "that the PPO was ASA" and did not represent that the

25   patients' treatment was "covered" under any Principal plan. DMC claims that it notified Principal that

26   the patients would receive treatment under MultiPlan's network and that Principal verified eligibility

27   and benefits. DMC notes the absence of Principal's assertions that: (1) the patients were not Principal

28   insureds; (2) Principal would not cover the patients' expenses under Principal's network arrangement

                                                    27

1  with MultiPlan; or (3) the patients were eligible and treated under the ASA Plan.  DMC's evidence

2  contradicts Principal's evidence that it communicated "that the PPO was ASA."  The crux is what

3  exactly Principal verified, that is, whether there was coverage under and limited to the ASA Plan,

4  whether there was coverage through the MultiPlan network, or whether there was coverage under an

5  unspecified network.  In the end, Principal fails to negate the absence of evidence for the positive

6  assertion element.

7  *Justifiable Reliance*

8  Principal further attacks the justifiable reliance element of negligent misrepresentation.  As to

9  Patient 1, Principal notes that the complaint negates DMC's justifiable reliance in that the complaint

10  alleges that Patient 1 was admitted on July 25, 2008 and discharged on July 28, 2008, the day on which

11  Principal authorized treatment.  Principal notes, in other words, that "treatment was provided before any

12  authorization was obtained."

13  As to all four patients, Principal argues that DMC's reliance on Principal's verification was not

14  justifiable given Principal's automated disclaimer that quoted benefits "are not a guarantee of payment"

15  and that "benefits are based on eligibility and plan provisions on the date of service."  Principal points

16  to the absence of specifics on DMC's reliance on an alleged misrepresentation.  The "mere assertion of

17  'reliance' is insufficient. The plaintiff must allege the specifics of his or her reliance on the

18  misrepresentation to show a bona fide claim of actual reliance."  *Cadlo v. Owens-Illinois, Inc.*, 125

19  Cal.App.4th 513, 519, 23 Cal.Rptr.3d 1 (2004).   "Actual reliance occurs when the defendant's

20  misrepresentation is an immediate cause of the plaintiff's conduct, altering his legal relations, and when,

21  absent such representation, the plaintiff would not, in all reasonable probability, have entered into the

22  transaction."  *Cadlo*, 125 Cal.App.4th at 519, 23 Cal.Rptr.3d 1.

23  "Whether reliance is justified is a question of fact for the determination of the trial court; the

24  issue is whether the person who claims reliance was justified in believing the representation in the light

25  of his own knowledge and experience." *Gray v. Don Miller & Associates, Inc.*, 35 Cal.3d 498, 503, 198

26  Cal.Rptr. 551 (1984).  In *OCM Principal Opportunities Fund v. CIBC World Markets Corp.*, 157

27  Cal.App.4th 835, 865, 68 Cal.Rptr.3d 828 (2007), the California Court of Appeal further explained

28  justifiable reliance:

28

Generally, "[a] plaintiff will be denied recovery only if his conduct is manifestly unreasonable in the light of his own intelligence or information. It must appear that he put faith in representations that were 'preposterous' or 'shown by facts within his observation to be so patently and obviously false that he must have closed his eyes to avoid discovery of the truth.' [Citation.] Even in case of a mere negligent misrepresentation, a plaintiff is not barred unless his conduct, in the light of his own information and intelligence, is preposterous and irrational. [Citation.]" (*Hartong v. Partake, Inc.* (1968) 266 Cal.App.2d 942, 965, 72 Cal.Rptr. 722.)

DMC argues that it justifiably relied on Principal's representations in that "Principal's statements verifying the patients [sic] eligibility and benefits were neither 'preposterous," nor "patently and obviously false." DMC points to Principal's requirement "to call and verify the eligibility and benefits." DMC attributes to Principal to know and expect "that providers like Doctors Medical will rely upon the information that Principal provides to them in verification calls." DMC characterizes as "irrelevant" Principal's disclaimer in that this action addresses wrong rates, not denied benefits.

DMC raises valid points except as to justifiable reliance on coverage for Patient 1. The complaint alleges that Patient 1 was admitted on July 25, 2008 and discharged on July 28, 2008, the day on which Principal authorized treatment. DMC had discharged Patient 1 prior to any point in which it could have reasonably relied on Principal's verification. Principal successfully negates the justifiable reliance element as to Patient 1 to warrant summary judgment for Principal on the (ninth) negligent misrepresentation claim.

However, Principal's success ends there. The parties agree that Principal represented the availability of benefits for Patients 2-4. The parties disagree on what coverage was represented to be available. DMC has presented evidence that it reasonably relied that it would be paid more than it received. DMC surmised that the patients would receive care under the MultiPlan network and has raised factual issues as to application of the Aetna PPO Agreement and ASA Plan. Such factual issues preclude finding that its reliance on Principal's coverage verification was unjustified. Principal's resort to its disclaimer offers it little comfort in that the issue is the applicable network and rates. Summary judgment is not warranted on the negligent misrepresentation claims as to Patients 2-4.

### Settlement Agreement Effects

Principal argues that the Settlement Agreement bars DMC's claims because they arose during the "Dispute Period" defined in the Settlement Agreement. Principal contends that pursuant to the

Settlement Agreement, Tenet, on DMC's behalf, released "claims of underpayment for treatment rendered to Aetna's Members" through December 31, 2008.  Principal argues that such release "extends to Principal Life as it is an agent of Aetna for the administration of the Patients' claims pursuant to the Network Agreement" between Principal and Aetna Life.  Principal concludes that Tenet, DMC's parent company, "has already settled the claims and released Principal Life from all liability."

DMC responds that the Settlement Agreement does not apply because this action arises out of the MultiPlan Agreement and the Settlement Agreement resolved claims against only Aetna.

DMC correctly challenges the applicability of the Settlement Agreement, which is between Tenet and Aetna Health Management, LLC.  Principal is not a party to the Settlement Agreement and fails to connect the Settlement Agreement to this action, especially given the factual issues whether the Aetna PPO Agreement or MultiPlan Agreement govern the rates at issue.  Moreover, there is no meaningful evidence that the Settlement Agreement released claims against Principal.

### Principal As Proper Party

Principal contends that it is not a proper defendant in that this dispute is between DMC and Aetna.  Principal summarizes that:

    1.    If the Aetna PPO Agreement, as modified by the Master Agreement, applies to ASA products, the Aetna PPO Agreement dictates applicable rates; or

    2.    If the Aetna PPO Agreement does not apply to ASA products, the MultiPlan Agreement dictates rates.

Principal notes that it is not a party to either the Aetna PPO Agreement, Master Agreement or MultiPlan Agreement and that "Aetna claims that ASA products are covered under the PPO Agreement and has instructed Principal Life to pay the claims accordingly."  Principal absolves itself of "responsibility for plan benefits" and attributes responsibility to Aetna to set rates to be paid to DMC.  Principal urges to examine and interpret the "business dealings" among Aetna, DMC and Tenet and characterizes itself as a "stranger" to such dealings with "no stake in the outcome of this dispute."

DMC responds that it provided services to the four patients under the MultiPlan Agreement, "for which Principal is the responsible payor.  Because this action is based upon the [MultiPlan] Agreement, not the Aetna PPO Agreement, Principal is a proper party."

1    Principal has not absolved itself of liability.  Principal sifts through multiple agreements and

2    offers varying interpretations of and interchanges among the agreements and parties to them.  Principal

3    fails to define clearly its role other than an as a healthcare plan administrator.  Based on the murky

4    record, this Court is unable to conclude that Principal is an improper defendant.

5                        **MultiPlan Agreement's Dispute Resolution Provision**

6    Principal argues that if the MultiPlan Agreement governs DMC's claims, the MultiPlan

7    Agreement's dispute resolution provision bars DMC's claims in this action.  The dispute resolution

8    provision calls for progressive steps to attempt to resolve disputes short of litigation.  The dispute

9    resolution provision requires DMC to provide MultiPlan at its Waltham, Massachusetts address "with

10   written notice specifying the nature of the dispute."  The dispute resolution provision states: "Neither

11   party shall institute any legal action or proceeding until the expiration of sixty days from the date of the

12   notice . . ."  Principal concludes that to enforce the MultiPlan Agreement, DMC "was required to follow

13   the procedures set forth therein."

14   Principal notes that under the MultiPlan Agreement, DMC was required to provide MultiPlan

15   with written notice of the nature of its dispute with Principal, and MultiPlan was required to initiate

16   discussions with Principal.  Principal points to an absence of DMC's "compliance with this condition

17   to filing suit" in that per Ms. Ferry's declaration, Principal "has not been contacted by any representative

18   of MultiPlan, Inc. initiating discussions to resolve this dispute."

19   DMC responds that the parties have waived the dispute resolution procedure by dogged pursuit

20   of this action.  *See Maxum Foundations, Inc. v. Salus Corp.,* 779 F.2d 974, 981 (4th Cir. 974) ("A litigant

21   may waive its right to invoke [arbitration] by so substantially utilizing the litigation machinery that to

22   subsequently permit arbitration would prejudice the party opposing the stay); *Davis v. Blue Cross of*

23   *Northern California,* 25 Cal.3d 418, 425, 158 Cal.Rptr. 828 (1979) ("California courts have found a

24   waiver of the right to demand arbitration in a variety of contexts, ranging from situations in which the

25   party seeking to compel arbitration has previously taken steps inconsistent with an intent to invoke

26   arbitration . . . to instances in which the petitioning party has unreasonably delayed in undertaking the

27   procedure"); *see also Khan v. Parsons Global Servs., Ltd.*, 521 F.3d 421, 428 (D.C. Cir. 2008) (filing

28   summary judgment motion suggests waiver of arbitration).

1    DMC is correct that "Principal has 'substantially utilized' the litigation machinery" to vitiate

2   benefits of the MultiPlan Agreement's dispute resolution procedure. Moreover, the record reveals

3   significant unsuccessful attempts to resolve the disputes at issue here to negate ceasing this action in

4   favor of other procedures. The MultiPlan Agreement's dispute resolution provision fails to support

5   summary judgment for Principal as does Principal's meaningless points regarding the parties' settlement

6   communications and DMC's apparent misunderstandings of which Principal seeks to take advantage.

7                                   **CONCLUSION AND ORDER**

8    For the reasons discussed above, this Court:

9    1.    GRANTS Principal summary adjudication on the complaint's (ninth) negligent

10         misrepresentation claim as to Patient 1;

11   2.    DENIES otherwise summary judgment; and

12   3.    CONFIRMS the May 12, 2011 pretrial conference and June 6, 2011 trial.

13   IT IS SO ORDERED.

14   **Dated:    April 14, 2011            /s/ Lawrence J. O'Neill**
                                    UNITED STATES DISTRICT JUDGE
15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                          32